**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TAMI COUTTS, | : | No. 3:05cv512 |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| JOANNE B. BARNHART, *Commissioner* | : | |
| *of Social Security*, | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Presently before the Court for disposition are Plaintiff Tami Coutts' objections to

Magistrate Judge Thomas M. Blewitt's Report and Recommendation.  The Report and

Recommendation proposes that we deny Coutts' appeal of Defendant Commissioner Joanne

B. Barnhart's decision to deny her claim for Disability Insurance Benefits under Title II of

the Social Security Act ("Act") 42 U.S.C. §§ 401-33.  The parties have fully briefed this

matter, and it is ripe for disposition.  For the reasons that follow, we will overrule Coutts'

objections and adopt the Report and Recommendation.

I.      **Background**

   A.      **Medical History**[1]

Coutts is forty one years of age and is a high school graduate.  (R. 780)  She has work

experience as a deli manager, office manager, and boat detailer.  (R. 780-81)  On July 28,

2001, Coutts was involved in a motor vehicle accident, and she alleges that as a result of the

accident, she suffered a lower back injury, a knee injury, and depression.  (R. 779)

Two days after her accident, she sought treatment for whiplash with her primary care

---

[1] We include only those background facts relevant to the issues raised in Coutts' objections, and
have omitted portions of the voluminous record that do not relate to these specific issues.

physician, Dr. Charles Aronica.  (R. 664-66)  Dr. Aronica prescribed pain killers, muscle

relaxers, and referred her to Dr. Scott Epstein.  (R. 201)  When Dr. Epstein examined Coutts

on October 19, 2001, she complained of a sense of tremor in her arms and pain in her lower

back radiating into her legs.  (R. 201-02)  She explained that her back pain was constant but

her leg pain was intermittent. (R. 202)  The pain increased when she sat upright, leaned to the

left, and walked or sat for fifteen minutes.  (R. 202)  She did not report neck pain, headache,

or upper arm pain or paresthesias.[2]  (R. 202)

Dr. Epstein found that x-rays taken the day after the accident were negative.  (R. 201)

He found her posture and back curvature normal.  (R. 202)  He performed an SI flexion test

and found that she had "mildly decreased left sacroiliac[3] and ischial[4] tuberosity[5] movement,"

but her right hip was normal.  (R. 202)  Gaenslen's[6] test was positive on both sides.  (R. 202)

On extension, she had lumbrosacral and sacroiliac discomfort.  (R. 202)  Supine straight leg

raises caused pain at 90 degrees.  (R. 202)  Pin prick tests revealed that the sensation in her

back was intact.  (R. 202)  Her neck had full range of motion of her neck with no tightness or

---

[2] Paresthesia: "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1371 (30th ed. 2003).

[3] Sacrum: "the triangular bone just below the lumbar vertebrae." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1650.  Os Ilium: "iliac bone: the expansive superior portion of the os coxae (hip bone)." Id. at 1329.

[4] Os ischii: "ischial bone: the inferior dorsal portion of the os coxae (hip bone)." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1329.

[5] Tuberosity: "an elevation or protuberance." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1965.

[6] Gaenslen's sign: "with the patient in the supine position, the knee and hip on one side are held in flexed position by the patient, while the other lower limb, hanging over the edge of the table, is pressed down by the examiner to produce hyperextension of the hip: pain occurs on the affected side in lubroscral disease." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1698.

spasm of the muscles in her neck and shoulder muscles.  (R. 203)  Flexion and extension

tests demonstrated normal strength in her arms and legs.  (R. 202-03)

She had full range of motion of her trunk and was able to touch her toes.  (R. 202)  Flexion

and extension tests for her legs demonstrated normal strength. (R. 202)

Based on these tests, Dr. Epstein diagnosed Coutts with bilateral low lumbar facet

strains, sacroiliac strains, and essential tremor.  (R. 203)  He recommended that she continue

with her chiropractic care, limit her anti-inflammatory medicine to one dose per day, and add

physical therapy.  (R. 203)  He discussed the possibility of bilaterial sacroiliac joint

injections, but she was uninterested at that time.  (R. 203)  He indicated he would revisit the

matter if she did not improve after two weeks.  (R. 203)

Dr. Epstein reexamined Coutts on November 7, 2001.  (R. 199)  SI flexion testing

revealed normal sacroiliac and ischal tuberosity movement.  (R. 199)  She also had no

tremors, normal gait, normal lumbar curve, normal pelvic posture, and no pelvic or sacroiliac

obliquity.  (R. 199)  She had mild tenderness of the sacroiliac joints and tenderness of the

lumbrosacral junction.  (R. 199)  Her seated straight leg raises were negative.  (R. 199)  Her

MRI revealed a central disc bulge at her sixth and seventh cervical vertebrae, and a small

right sided disk bulge at her fourth and fifth cervical vertebrae.  (R. 199)  Dr. Epstein opined

that she suffered from low lumbar facet strain, bilateral sacroiliac strain, and facet strains at

the juncture of her lumbar spine and sacrum.  (R. 199)  He recommended bilateral steroid

injections in her sacroiliac joint and at the juncture of her lumbar spine and sacrum.  (R. 200)

On November 15, 2001, Coutts received a lumbar epidural steroid injunction at her

fifth lumbar vertebra and sacrum.  (R. 188)  She received a bilateral sacroiliac joint steroid

3

injection on December 12, 2001.  (R. 174)  Thereafter, she received two more injections in

her lumbar spine and sacroiliac joint.  (R. 782)

On December 28, 2001, Coutts returned to Dr. Epstein and reported that her injections

provided ten days of total relief and thereafter the pain was drastically reduced from what she

experienced pre-injection.  (R. 196)  She had a full range of trunk motion but had some

sacroiliac discomfort on extension and extension accompanied by side bending or trunk

rotation.  (R. 196)  She again had normal sacroiliac and ischal tuberosity movement on SI

flexion testing.  (R. 196)  Gaenslen's test was still positive bilaterally.  (R. 196)  Dr. Epstein

reaffirmed his previous diagnosis of bilateral sacroiliac and low lumbar facet strains, but

explained Coutts had "excellent improvement after the most recent set of injections with pain

being gone for ten days, but now at 1 out of 10."  (R. 196)

On April 12, 2002, Dr. Epstein examined Coutts and again diagnosed her with low

lumbar facet and sacroiliac strains and also found paresthesias in her left arm.  (R. 194)  She

reported that her most recent sacroiliac joint injections brought her relief for about two and

one half months, but over the six or seven weeks immediately prior to the examination her

pain returned.  (R. 193)  She also complained of vertigo.  (R. 193)  On physical examination

he found "no vertigo or rotatory nystagmus."[7]  (R. 193)  He found normal strength and

sensation in her legs.  (R. 194)  Her straight leg raises were negative bilaterally.  (R. 194)  He

found tenderness in her sacroiliac joints and low lumbar facet areas.  (R. 194)  She had

discomfort in these areas with trunk extension, extension with bilateral side bending, and

_____

[7] Nystagmus: "an involuntary rapid, rhythmic movement of the eyeball."  DORLAND'S
ILLUSTRATED MEDICAL DICTIONARY at 1296.

4

extension with trunk rotation.  (R. 194)  She had no pain with forward flexion or side

bending accompanied by forward flexion.  (R. 194).

On May 3, 2002, Coutts visited Dr. Epstein and reported that she received an injection

on April 17, 2002 that provided relief for a day and a half.  (R. 191)  He noted that the relief

from the injections confirmed that the sacroiliac joints were the source of the pain, and he

noted she had "excellent improvement with the anesthetic phase from the recent sacroiliac

joint injections."  (R. 191)  He recommended that she continue pain medication, but did not

recommend any other treatment.  (R. 191-92)  He noted that the November 2001 MRI

revealed minimal abnormality between the forth and fifth lumbar vertebrae but was otherwise

negative.  (R. 192)  He therefore suggested that they repeat the MRI and he ordered an EMG

of her lower extremities.  (R. 192)  He also wondered, "Is there some somatization[8] going on

presenting the sacroiliac pain?  That may be.  The patient has no report of any excessive

stressors in her life that may be somaticizing themselves as back pain."  (R. 192)

Coutts also received treatment for depression.  On April 16, 2003, she had her initial

consultation with Dr. Matthew Berger to discuss her mental condition.  (R. 291)  Coutts

reported "chronic depressive symptoms" such as feelings of sadness, loss of energy and

motivation, fatigue, worthlessness, irritability, excessive worrying, and impaired

concentration.  (R. 291)  She felt very limited in her activities secondary to her injury.  (R.

291)  She also explained symptoms consistent with chronic anxiety, such as excessive

muscular tensions and panic attacks.  (R. 291)  She denied manic symptoms such as

---

[8] Somatization: "in psychiatry, the conversion of mental experiences or states into bodily symptoms."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1721.

obsessive, intrusive, and persistent thoughts or compulsive, ritualistic acts.  (R. 291)  She

reported no hallucinations, delusions, or other symptoms of psychotic process.  (R. 291)  Dr.

Berger described her as "angry, friendly, fully communicative, casually groomed, but looks

unhappy."  (R. 292)  He explained that her "[a]ssociations are intact, thinking is logical, and

thought content is appropriate.  Cognitive functioning and fund of knowledge indicate

cognitive functioning in the normal range.  Insight into illness is normal.  Social judgment is

intact."  (R. 292).

### C.    Procedural History

Coutts filed for disability insurance benefits on April 25, 2002, alleging inability to

work since July 28, 2001 due to constant back pain, headaches, dizziness, and the effects of

pain medication.  (R. 51, 62)  Her claim was initially denied and she filed a timely request for

an administrative hearing.  (R. 47)  A hearing was held before an ALJ on October 1, 2003, at

which Coutts and a vocational expert testified.  (R. 755-880)  On December 13, 2003, the

ALJ issued a decision denying benefits.  (R. 33)  The Appeals Council denied Coutts' review

on January 31, 2005, thereby making the ALJ's decision the final decision of the

Commissioner.  (R. 4)  Coutts filed the instant appeal of this decision on March 11, 2005.

(Doc. 1).  On December 16, 2005, Magistrate Judge Blewitt issued a Report and

Recommendation suggesting that we deny the appeal.  (Doc. 11).  On January 5, 2006, Coutts

filed the objections that are presently before the Court.

### II.    Standard

In disposing of objections to a magistrate's report and recommendation, the district

6

court must make a *de novo* determination of those portions of the report to which objections are made.  28 U.S.C. § 636 (b)(1)(C); see also Henderson v. Carlson, 812 F.2d 874, 877 (3d Cir. 1987).  This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.  The judge may also receive further evidence or recommit the matter to the magistrate with instructions.  Id.

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).  It is less than a preponderance of the evidence, but more than a mere scintilla.  Id.

### III.   Disability Definition

Disability is defined in the Social Security Act in terms of the effect a physical or mental impairment has on a person's ability to perform in the workplace.  In order to receive disability benefits, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.A. § 423(d)(1)(A).  The Act further provides that a person must "not only [be] unable to do his previous work but [must be unable], considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such

7

work exists in the immediate area in which he lives, or whether a specific job vacancy exists

for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A);

Heckler v. Campbell, 461 U.S. 458, 459-60 (1983).

In the analysis of disability claims, the Commissioner employs a five-step sequential

evaluation. 20 C.F.R. § 416.920. The initial three steps are as follows: 1) whether the

applicant is engaged in substantial gainful activity; 2) whether the applicant has a severe

impairment; 3) whether the applicant's impairment meets or equals an impairment listed by

the Secretary of Health and Human Services as creating a presumption of disability. If the

claimant cannot establish step three, she must demonstrate: 4) that the impairment prevents

the applicant from doing past relevant work. See 20 C.F.R. §§ 404.1520, 416.920. If the

applicant establishes steps one through four, then the burden is on the Commissioner to

demonstrate the fifth step, that there are jobs in the national economy that the claimant can

perform. Jesurum v. Secretary of the U.S. Dept. of Health and Human Services, 48 F.3d

114, 117 (3d Cir. 1995).

## IV.    Discussion

Coutts argues that Magistrate Judge Blewitt erred in upholding: 1) the ALJ's finding

that she did not meet or equal a listed impairment; and 2) the ALJ's credibility determination.

For the reasons that follow, we find no error in the Report and Recommendation, and we will

overrule the objections.

### A.    Listed Impairments

Coutts argues that the ALJ erred in finding that she did not meet the listed

8

impairments for disorders of the spine and affective disorders.  We find substantial evidence

supporting the ALJ's decision.  Disorders of the spine are defined as follows:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal
> stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture),
> resulting in compromise of a nerve root (including the cauda equina) or the spinal
> cord. With:
> > A.      Evidence of nerve root compression characterized by neuro-anatomic
> > distribution of pain, limitation of motion of the spine, motor loss
> > (atrophy with associated muscle weakness or muscle weakness)
> > accompanied by sensory or reflex loss and, if there is involvement of
> > the lower back, positive straight-leg raising test (sitting and supine);

20 C.F.R. Part 404, Subpart B, Appx 1, § 1.04.

Coutts failed to exhibit many of the required characteristics.  Dr. Epstein found no

muscle weakness or atrophy and no sensory or reflex loss.  Also, her straight leg raises were

negative.

Similarly, we find substantial evidence to support the ALJ's decision that she did not

meet the listed impairment for affective disorders.

> 12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied
> by a full or partial manic or depressive syndrome. Mood refers to a prolonged
> emotion that colors the whole psychic life; it generally involves either depression
> or elation. The required level of severity for these disorders is met when the
> requirements in both A and B are satisfied, or when the requirements in C are satisfied.
> A. Medically documented persistence, either continuous or intermittent, of one of
> the following:
> 1. Depressive syndrome characterized by at least four of the following:
> a. Anhedonia or pervasive loss of interest in almost all activites; or
> b. Appetite disturbance with change in weight; or
> c. Sleep disturbance; or
> d. Psychomotor agitation or retardation; or
> e. Decreased energy; or
> f. Feelings of guilt or worthlessness; or
> g. Difficulty concentrating or thinking; or
> h. Thoughts of suicide; or
> i. Hallucinations, delusions, or paranoid thinking; or
> 2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or
b. Pressure of speech; or
c. Flight of ideas; or
d. Inflated self-esteem; or
e. Decreased need for sleep; or
f. Easy distractability; or
g. Involvement in activities that have a high probability of painful consequences
which are not recognized; or
h. Hallucinations, delusions or paranoid thinking;
or
3. Bipolar syndrome with a history of episodic periods manifested by the full
symptomatic picture of both manic and depressive syndromes (and currently
characterized by either or both syndromes);
AND
B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;
OR
C. Medically documented history of a chronic affective disorder of at least 2 years'
duration that has caused more than a minimal limitation of ability to do basic
work activities, with symptoms or signs currently attenuated by medication or
psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that
even a minimal increase in mental demands or change in the environment would
be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly
supportive living arrangement, with an indication of continued need for such an
arrangement.

20 C.F.R. Part 404, Subpart B, Appx. 1, § 12.04.

We find substantial evidence in support of the ALJ's conclusion that Coutts did not

meet part B.  Dr. Berger explained:

Associations are intact, thinking is logical, and thought content is appropriate.
Cognitive functioning and fund of knowledge is intact and age appropriate.
Short and long term memory are intact, as is ability to abstract and do
arithmetic calculations.  This patient is fully oriented.  Vocabulary and fund
of knowledge indicate cognitive functioning in the normal range.  Insight into
illness is normal.  Social judgment is intact.  There are no signs of anxiety.

10

She is restless and needs to change positions often.
(R. 292).

Thus, Dr. Berger's analysis directly contradicts Coutts' assertion that she has marked restrictions in daily life.  He suggested no marked restrictions or difficulties in her cognitive process or social functioning, and she had no episodes of decompensation.  Therefore, we find that the ALJ did not err in finding that her condition did not meet or equal listed impairments 1.04 or 12.04.

**B.      Credibility**

Coutts asserts that the ALJ erred in concluding that she retained the capacity for light work.   She testified that she was unable to perform any work, and she argues that the ALJ did not give proper weight to her testimony.

Coutts testified that she was in constant pain and was unable to perform even the slightest of daily activities.  Coutts described her back pain as follows: "I have severe pain where all movement is pretty much painful.  The pain never goes away.  It's always there, and only intensifies with any movements."  (R. 781-82).   She rarely showered, and had discomfort brushing her teeth and styling her hair.  (R. 785).   Her children cleaned the house, mowed the lawn, and shopped for groceries.  (R. 786).

The ALJ, however, found that Coutts exaggerated the extent of her limitations, and concluded that she was able to engage in light work.  We find substantial evidence supporting his conclusion.

When a claimant complains of pain and establishes that she suffers from a medical

11

impairment that could reasonably be expected to produce the pain, the ALJ must "determine the extent to which [the] claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it."  Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). The ALJ may consider:  1) daily activities; 2) "the location, duration, frequency, and intensity" of the pain and symptoms; 3) "precipitating and mitigating factors;" 4) "the type, dosage, effectiveness, and side effects" of any medication used to alleviate the pain or symptoms; 5) treatment other than medication; 6) other measures used to relieve pain; and 7) other factors concerning functional limitations.  20 C.F.R. § 416.929(c)(4); 20 C.F.R. 404.1529(c)(4).  Generally we must defer to the ALJ's credibility determinations because he had the opportunity to assess Coutts' demeanor.  Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).

The ALJ extensively surveyed her daily activities, her pain and symptoms, her treatment, and the objective medical evidence.  He noted she exaggerated her limitations because her physical therapy report noted that she painted a room and suffered no pain until later that night.  The record revealed that she rode in a car to Pittsburgh four times in a two week period, suggesting that she was able to sit for longer periods than she claimed.  He observed that the medical diagnoses and objective testing were inconsistent with the extreme limitations to which Coutts testified.  Particularly, upon examination, her straight leg raises were consistently negative, her Romberg's[9] test was negative, she had no significant

---

[9] Romberg's sign: "swaying of the body or falling when standing with the feet close together and the eyes closed; the result of loss of joint position sense, seen in tabes dorsalis and other diseases affecting the posterior columns."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1702.

neurological findings, and her condition improved with treatment and therapy.  He noted that

she had no injections after April 2002.  Thus, substantial evidence supported the ALJ's

conclusion that Coutts exaggerated the extent of her limitations and was able to perform light

work.  Accordingly, we will overrule Coutts' objections and adopt the Report and

Recommendation.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TAMI COUTTS,** | : | No. 3:05cv512 |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **JOANNE B. BARNHART,** *Commissioner* | : | |
| *of Social Security,* | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

**AND NOW**, to wit, this 15th day of March 2006, it is hereby **ORDERED** that:

1)  Plaintiff's Objections (Doc. 12) are **OVERRULED**;

2)  The Report and Recommendation (Doc. 11) is **ADOPTED**;

3)  Plaintiff's appeal (Doc. 1) is **DENIED**; and

4)  The Clerk of Court is directed to close this case.

**BY THE COURT:**

**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**